**In re Homer BRYANT, Debtor.**

**James H. KELLER, formerly dba Truckee Meadows Mortgage, a proprietorship, now known as Truckee Meadows Mortgage Company, a Nevada corporation, both as trustees, Plaintiff,**

**v.**

**Homer BRYANT; Edith M. Lyons; and Charles B. Lyons, Defendants.**

**Bankruptcy No. BK–R–82–0594. Adv. No. 82–404.**

United States Bankruptcy Court, D. Nevada.

March 30, 1984.

Gregory D. Corn, Reno, Nev., for plaintiff.

Paul A. Bible, Janet L. Chubb, Chubb & Feinstein, Reno, Nev., for defendants.

*Memorandum Decision*

ROBERT C. JONES, Bankruptcy Judge.

*Introduction*

When the debtor filed his Chapter 11 petition on 21 July 1982 the estate's principal asset was a parcel of real property located at Lake Tahoe, Nevada, which he held in joint tenancy with Edith and Charles Lyons (mother and son, respectively). This property was subject to a deed of trust securing a $200,000.00 note dated 23 December 1980. This note evidenced a loan made to the debtor and the Lyonses for the purpose of constructing improvements on the property. On 29 December 1982 James H. Keller, fdba Truckee Meadows Mortgage (TMM), a sole proprietorship, now incorporated as Truckee Meadows Company, as "trustee," filed a complaint to have 11 U.S.C. § 362's stay lifted to allow pursuit of its remedies under the trust deed (the non-judicial foreclosure sale was scheduled for 22 July 1982—the day *after* the petition was filed). The debtor's answer included affirmative defenses challenging the amount of plaintiff's secured claim. Thereafter, the parties stipulated to continue trial several times while, apparently, the defendants attempted to sell the property.

Pursuant to stipulation, on 1 August 1983 this Court signed an order authorizing the sale of the real property. The order provided for retention of the future sale proceeds (less costs incidental to sale) in an interest-bearing trust account pending a decision on the true value of plaintiff's claim. Likewise, the 21 November 1983 order confirming the debtor's liquidation plan of reorganization required that the sale proceeds be held "pending determination of the interests in such proceeds and allowability of the claims contained in Classes B [allowed secured claim of TMM] and C [claim of Edith Lyons as joint tenant with the debtor of the subject real property] of the Amended Plan." (By the time of confirmation, Charles Lyons had died.)

In furtherance of the earlier challenge to plaintiff's claim on 13 September 1983 counsel for all three defendants filed a motion for summary judgment asserting that, as a matter of law, plaintiff was only entitled to the unpaid principal amount of its note—all other amounts being usurious. In response, plaintiff filed an opposition to defendants' motion, a cross motion for summary judgment, and points and authorities supporting its position. In effect, although the underlying complaint for relief from the stay was rendered moot by the 1 August 1983 order authorizing the debtor to sell the property, the parties have treated the present usury-related issues as a "counterclaim" to the plaintiff's complaint. On 16 September 1983 the motion and cross motion for summary judgment were, with the parties' assent, consolidated for trial.

*Facts*

The facts presented at trial by way of testimony, documentary evidence, and the deposition of James H. Keller were largely uncontested.

Plaintiff Keller did business as a sole proprietorship, TMM, from approximately 1978 until the incorporation of the business as Truckee Meadows Mortgage Company in November 1981. For 20 years Keller has been a licensed real estate broker. During the time of this transaction, Keller dba TMM was a licensed mortgage company as required by NEV.REV.STAT. ch. 645B (1981). As such, he was in the business of arranging loans from third parties to borrowers who requested his services. These loans were secured by trust deeds on real property. Through the use of "loan representatives" and advertising TMM would locate prospective borrowers and lenders. No evidence was presented to show how the parties to this transaction came to use Keller's services.

Once a prospective borrower decided to use TMM's services a "loan package" was prepared based upon the borrower's personal history and the real property security. This package was then presented to the prospective lender or lenders. The $200,000.00 defendants sought to borrow for construction of a dwelling on the Lake Tahoe lot was gathered from several parties in California and Nevada (listed below with the dates their money was transferred to TMM's trust account):

1) Sharon A. Laughton ($10,000.00) on 15 December 1980.

2) J.E. Binker ($15,000.00) on 15 December 1980.

3) Central Pacific Investment (CPI) ($45,000.00) on 23 December 1980. (CPI is a California mortgage broker which obtained this money from Richard and Valarie Gunst ($10,000.00), John Morton ($25,000.00), and Joseph and Marie Arguelles ($10,000.00)—all from California.)

4) Norris Supply Co. ($100,000.00) on 21 November 1980.

5) Moltzen Electric ($30,000.00) on 12 December 1980.

Because the Norris Supply money was contributed approximately one month before this loan was funded, upon receipt by Keller it was transferred from the TMM trust account to a money market account where it earned some $300 in interest for Norris. (The Norris representative testified that the money was transferred after the loan package had been examined and well in advance so as to ensure its availability whenever the loan's funding was possible—presumably when the other $100,000.00 was obtained.)

Although receipts from TMM to these above contributors bore the description "for investment," those contributors who testified at trial unanimously said the money was not lent to Keller nor to TMM, was not invested in TMM, but was a loan to the actual borrowers (the defendants), to whom they looked for repayment. CPI's investor worksheet, prepared for the benefit of the Gunsts, Morton, and the Arguelleses, showed the "borrower" as "Truckee Meadows Mortgage (Lyons & Bryant)."

With the $200,000.00 on deposit in TMM's trust account or otherwise readily available, on 23 December 1980 the defendants executed a first deed of trust with Washoe Title Guaranty Co. (WTGC) as trustee and Keller, "Trustee," as benefici-

ary. Simultaneously, the defendants executed a promissory note with a face amount of $200,000.00 payable to Keller, "Trustee," which bore an annual interest rate of 24% payable in interest-only monthly installments of $4,000.00 beginning 24 January 1981 and ending 24 June 1982 (when the principal amount became due in full). The note also provided that "[t]here shall be a late penalty due Truckee Meadows Mortgage, (the third party collection agent of this transaction) which shall be computed and which shall be $5.00 per day for each and every day the said payment is not made commencing five (5) days after its due date."[1] The designation of Keller as "Trustee" was not accompanied by any trust documents but was done for the sole purpose of simplifying the administration and servicing of the loan, according to the testimony of Keller and the trustee for the Norris Supply Profit Sharing Plan (for whose benefit the Norris contribution was made).

The escrow documents reveal the following relevant facts. The escrow instructions directed to WTGC (dated 19 December 1980 and signed by Keller as "Trustee" and by the defendants) included this language: "Truckee Meadows Mortgage is authorized and instructed to hold the sum of $_____ which represents 1 years [sic] payments and to pay same each month when due. After the first year, payor hereunder is to make the monthly payments to Washoe Title Guaranty Company, until the maturity date." The first year's interest-only payments totaled $48,000.00 and this amount, along with a $28,000.00 commission to TMM (14 points based on the principal amount), and other incidental costs of loan processing, was deducted from the $200,000.00 loan. The 14-point commission received by TMM was shared with CPI for its efforts in finding the California contributors. With these deductions the net amount received by the defendants

at the close of escrow was $123,145.00. The $48,000.00 deduction was also described in the installment servicing instructions (directed to WTGC) as "1 years [sic] prepaid interest outside escrow," and in the escrow closing statement as "1 years [sic] prepaid interest paid to Truckee Meadows."

According to the trial testimony, but for this $48,000.00 fund the loan would not have been made; clearly it was a condition for making the loan. However, it is not clear whose condition it was initially—Keller's or the contributors'. Keller testified that he advised the contributors to require this fund and they agreed it was necessary. The fact remains that the contributors would not have provided the $200,000.00 without this condition. Keller testified that the condition was required because the defendants admitted they were otherwise unable to make the monthly payments of $4,000.00.[2] The contributors variously described the fund as "guarantee money" or "additional security" to ensure payment of the monthly amounts due under the note. This fund was nominally held in TMM's trust account and checks were drawn on this account each month until the fund was exhausted. Actually, the evidence showed the money was placed in a money market account then withdrawn and deposited into the TMM trust account as needed to cover the monthly checks drawn and paid to WTGC's installment servicing account for eventual disbursement to the contributors. This money did not sit idly merely accumulating interest for the defendants (although it did do that); in addition to its agreed use (making the monthly payments on the note), TMM's own records show that the money was used to fund other loans arranged by Keller dba TMM with all interest thereon credited to the benefit of defendants/borrowers. Presumably Keller received a commission in the form of points from these transactions also. Aside from

---

1. Although the note's specified late charge was $5.00 per day, the defendants' own statement of undisputed facts agrees with the plaintiff's position that it is now accruing at $20.00 per day.

2. The monthly amount drawn from the $48,000.00 fund and paid to WTGC for disbursement to the contributors was actually slightly more than $4,000.00 ($3 or $4) because of the inclusion of a "payor's fee."

such investment of the funds, neither the contributors nor the borrowers could use it for any purpose other than making the monthly interest payments.

Upon receipt of the monthly check from TMM, WTGC then wrote checks from its installment servicing account to the three CPI-originated contributors and one check to Keller, as "Trustee." With this lump sum check Keller credited the TMM accounts of the Reno contributors: Laughton, Binker, Moltzen Electric, and Norris Supply. These accounts were operated similarly to the $48,000.00 fund's account—the interest payments were used, in part, to fund other loans through TMM. At the end of each calendar year TMM provided an IRS Form 1099 to those with such accounts.

With the first year's interest under TMM's supervision (subject to the agreed restrictions), the monthly payments were regularly made through January 1982. When the interest-only payment due 24 February 1982 was unpaid, Keller gave notice on 16 March 1982 of default and election to sell under the trust deed, pursuant to NEV.REV.STAT. § 107.080 (1979). The notice of the trustee's sale to be held on 22 July 1982 was given by WTGC on 24 June 1982. According to Keller's testimony, the costs of collecting such defaulted loans is ultimately borne by the respective lenders, if the security is insufficient.

### Arguments of Counsel / Issues

#### A. Defendants (borrowers)

The defendants posit three principal arguments in support of their contention that this transaction was usurious. First, the $48,000.00 fund was the exaction of interest in advance that reduced the amount of principal on which interest could properly be charged. Second, the 14-point commission paid to Keller dba TMM should be included in the interest calculation because a) TMM was the actual lender, or b) TMM, if not the lender, was at least an agent of the lenders for the purpose of making the loan and not an independent broker. Third, the late penalty specified in the note should be added to the usury calculation as interest. Consistent with the defendants' position the Court observes that because the note charged the maximum rate of interest then allowed mortgage company-arranged loans (3½% over the prime rate, or 24%) any increase in the effective rate by whatever means would render the loan usurious and require the forfeiture of all interest charged.

#### B. Plaintiff

Plaintiff challenges the defendants' characterization of the $48,000.00 fund as prepaid interest because it was never in possession of the actual lenders. Also, the commission as interest argument is rejected because TMM acted as a broker only. And plaintiff counters the late charges argument by asserting that they cannot be computed as interest to the lenders when they are paid to a third party, and, alternatively, that they are valid as reasonable liquidated damages.

#### Discussion

##### I.

As operative in December 1980, Nevada's general usury statute, NEV.REV.STAT. ch. 99 (1979) [3] included a relatively new definition of "interest" (enacted in 1979) and a provision that made clear that agreements for more than the legal maximum were void as to all interest. That same 1979 legislative enactment [4] also amended NEV.REV.STAT. ch. 645B regarding the maximum amount of interest allowable in credit transactions secured by real property and made by or through a mortgage company. These applicable statutes, NEV. REV.STAT. §§ 99.035, 99.050, and 645B.195, are set forth below:

> any rate of interest on money due or to become due on any contract."

**3.** In 1981, NEV. REV. STAT. ch. 99 was amended to eliminate the interest ceiling on most transactions. NEV. REV. STAT. § 99.050 (1981): "Parties may agree for the payment of

**4.** 1979 Nev.Stat. Ch. 498.

99.035 Except as otherwise provided by statute with respect to a particular kind of transaction:

1. "Interest" includes every payment made to the lender or with his knowledge to any third party as an incident to or condition of the extension of credit, such as a commission, bonus, fee, premium or penalty.

2. "Interest" does not include:

(a) Reasonable amounts actually applied in payment of the expense of inspecting or appraising any security offered in connection with the loan, investigating the responsibility of the applicant or procuring or extending any abstract of title or certificate of title insurance covering the security.

(b) The amount actually paid for the examination of any such abstract or title insurance certificate.

(c) The cost of the preparation, execution and recording of any papers necessary in consummating the loan.

(d) Charges or premiums for credit life, accident or health insurance, or insurance against loss of income, written in connection with any credit transaction if:

(1) The insurance is not required by the lender and this fact is clearly and conspicuously disclosed in writing to the borrower; and

(2) Any borrower desiring such insurance coverage given specifically dated and separately signed affirmative written indicating of this desire after receiving written disclosure to him of the cost of such insurance.

(e) Charges or premiums for insurance, written in connection with any credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, if a clear, conspicuous, and specific statement in writing is furnished by the lender to the borrower setting forth the cost of the insurance if obtained from or through the lender and stating that the borrower may choose the person through whom the insurance is to be obtained.

99.050 Parties may agree for the payment of any rate of interest on money due or to become due on any contract which does not exceed the rate of 18 percent per annum. In computing the rate of interest, any payment made or amount included in the obligation, as consideration for the extension of credit, which is computed as a percentage of the amount of the credit extended must be prorated over the period from the extension of credit to the date when the final payment is due. Any agreement for a greater rate of interest than specified in this section is void as to all interest.

645B.195 1. For an extension of credit which is secured by a deed of trust or mortgage of real property and which is made by or through a mortgage company, the rate of interest must not exceed the greater of:

(a) Twelve percent per annum; or

(b) If the lowest daily prime rate at the three largest United States banking institutions is 9 percent or more, that lowest daily prime rate plus 3.5 percent.

2. If the rate of interest exceeds 12 percent:

(a) The lender shall certify on the loan document, under penalty of perjury, what the lowest prime rate is on the date of execution of the final loan document.

(b) The lender shall not impose any charge or penalty for prepayment of all or any part of the loan.

(c) The lender shall not require any compensating balance or use any other device to increase the cost to the borrower of borrowing the net amount of the loan.

3. For the purposes of this section, "interest" does not include any payment made to a third party, or amount included in the obligation for payment to a third party, as consideration for the extension of credit, which is computed as a percentage of the amount of the credit extended.

At the outset, the Court notes that defendants have the burden of proving this transaction was usurious by a preponder-

ance of the evidence. *Pease v. Taylor*, 88 Nev. 287, 496 P.2d 757, 759 (1972).

█ The parties agree that the payment received by the "contributors" under the note did not exceed § 645B.195's statutory limit. It is also apparently agreed that if in fact these contributors were the actual "lenders" and Keller acted throughout the transaction as an independent broker, then this transaction is not tainted with usury. However, because the note's stated return of interest was at the statutory maximum, any other charge or fee for the transaction, no matter how disguised, if exacted by the lenders or their agent would be computed as part of the interest, *United Mortgage Co. v. Hildreth*, 93 Nev. 79, 559 P.2d 1186 (1977); *Miller v. York*, 92 Nev. 226, 548 P.2d 941 (1976), thereby exceeding the limit and rendering all interest void. Accordingly, crucial to the defendants' position is a finding by this Court that Keller exacted his commission and seeks to claim late charges under the note[5] in the capacity of lender or agent for the lenders. In light of this position it must be observed that "where one negotiates a loan through a broker with a moneylender, and the latter bona fide lends the money at a legal rate of interest, the transaction is not made usuri-

ous by the fact that the broker charges the borrower a commission for his services." *United Mortgage Co. v. Hildreth*, 599 P.2d at 1187.[6]

█ In spite of the defendants' arguments and the designation of Keller, "Trustee," as the note's payee and the trust deed's beneficiary, the Court finds that the California and Reno contributors were the lenders in this transaction and the defendants were the borrowers. The contributors viewed themselves as lenders secured by a first trust deed. They had in mind the borrowers and the property as the sole sources of repayment of principal plus interest. They did not view themselves as depositors seeking a guaranteed return but rather as lenders seeking the maximum statutory interest, subject to the usual risks attending such a transaction. Moreover, the documents (ledgers and work sheets) used by CPI and TMM show the contributors' money was plainly ear-marked for loans to the defendants. As for the use of Keller as a "trustee," at most this was a limited agency for the sole purpose of administering and servicing the loan. In *Wood v. Froerer Corp.*, 96 Nev. 468, 611 P.2d 193 (1980), the Nevada Supreme Court

---

5. While plaintiff has argued that the late charges are not properly included in any usury calculus because they are uncollected, usury laws show an intent to prohibit "agreements" regardless of the amounts collected. *Southwestern Investment Co. v. Hockley City Seed & Delinting, Inc.*, 511 S.W.2d 724 (Tex.Civ.App.1974); *National American Life Insurance Co. v. Bayou Country Club, Inc.*, 16 Utah 2d 417, 403 P.2d 26 (1965).

6. Even "heavy commissions" are not necessarily proscribed: "When one negotiates a loan through a third party with a money lender, and the latter bona fide lends the money at a legal rate of interest, the contract as to the actual lender is not made usurious merely by the fact that the intermediary charges the borrower with a heavy commission, the intermediary having no legal or established connection with the lender." *Crow v. Home Savings*, 522 S.W.2d 457, 459–60 (Tex.1975).

The commission paid TMM was in the form of "points." As amended in 1979, NEV. REV. STAT. 645B.195.3 excludes from the interest calculus "any payment made to a third party, or amount included in the obligation for payment to a third party, as consideration for the exten-

sion of credit which is computed as a percentage of the amount of the credit extended." This final version, as passed, incorported changes proposed by the Conference Committee and was intended "to limit the allowance of points without counting them, to those which are the compensation of the broker if he is acting for another. If the broker is lending his own money, he doesn't get them." SB 26, Minutes of Senate Judiciary Committee, 8 May 1979. In other words, points paid to an independent broker are not interest. This section recognizes that the mortgage companies' principal form of income is the points paid by the borrower in consideration for the broker's work in arranging the loan. Of course, this assumes there is a true arm's length relationship with the lender or lenders. § 645B.195.3 was further refined to reduce any possible ambiguity by the 1981 amendment (inapplicable here), which reads: "For all purposes of this section, 'interest' does not include any payment made to a mortgage company as consideration for arranging a loan when the company acts independently of the borrower and lender."

saw no usury problem with the use of the mortgage broker as payee and beneficiary as a matter of convenience because the loan involved the use of multiple lenders. Such is the case here. The lenders and the borrowers knew they were dealing through Keller as the mortgage broker. Having concluded that Keller dba TMM was not the lender, the question of his relationship to the lenders relative to the loan funding must be explored.

A purportedly independent broker's remuneration has been held includable as interest in circumstances in which the broker had a "legal or established connection with the lender." *Miller v. York*, 548 P.2d at 943, quoting *Pease v. Taylor*, 496 P.2d at 760. In *Miller* the court held that the "transaction was not the act of an independent lender or independent broker," 548 P.2d at 943, because of a close family relationship between the broker and lender. The loan was part of the *res* of a family trust whose beneficiaries were the wife and children of the broker. The court observed that "[t]ransactions by which one member of a family receives commissions for alleged services in negotiating loans from another member of the family have been held usurious where they appeared to be merely devices by which an excessive compensation was received for the loan." *Id.* Unlike the *Miller* case, defendants herein have presented no evidence showing a regular established connection between the lenders and TMM.

The related question of a legal or agency relationship between lender and broker has been much litigated in the usury context. Judge George, in a careful analysis of this problem that included a survey of the cases then extant, has enumerated four facts common to those cases finding that the broker's commission was chargeable as interest:

1. In all the lender benefitted either from being given a share of the commission or by being relieved of the obligation to pay the broker for acting in a capacity which was primarily intended to be of benefit to the lender, as opposed to the borrower.

2. In all the broker and the lender were dealing at less than arms length.

3. In all the broker and the lender acted in a consistent pattern which suggested that the particular transaction in question was only part of an ongoing relationship between those parties.

4. In all there existed at least some tacit agreement to have the broker refer prospective borrowers to that lender exclusively.

*In re Collet*, No. BK–LV–74–488, slip op. at 10 (Bkrtcy.D.Nev. Feb. 3, 1978). These factors are not present in this case. There was no showing that the lenders shared Keller's commission,[7] nor that the lenders required the borrowers to pay Keller's commission as a condition of making the loan. *See* NEV.REV.STAT. § 99.035.1 (1979) (repealed 1981). "The mere fact that the lender knows a commission is being exacted is not fatal when the commission is paid with the consent of the borrower to an agent who has been employed by him to seek a loan, or to a broker whose services have been rendered to both parties, and who does not rebate part of the commission to the lender." *Forte v. Nolfi*, 25 Cal.App.3d 656, 102 Cal.Rptr. 455, 472 (1972). Moreover, it was not shown that Keller's services were intended primarily for the benefit of the lender, and not the borrowers. The second and fourth factors were not proven, and the Court has already rejected any finding of an ongoing relationship or established connection between the lenders and TMM.

## II.

■ The Court now turns to whether the lenders' conditions regarding the $48,000.00 rendered the loan usurious. Defendants argue that the lender's condition requiring the $48,000.00 fund was, in effect, the deduction of interest in advance. If this were a textbook case of prepaid

---

7. Keller did share his commission with CPI, but CPI was not a lender, and there was no evidence that the California lenders knew of this arrangement between CPI and Keller.

interest then the loan would be usurious—the general rule being that "[i]f a lender charges the maximum amount of interest permissible under the Usury Law, no interest may be lawfully collected in advance. If interest is deducted in advance from the loan, in testing the transaction for usury the principal sum advance will be considered as the amount of the loan *less* the interest deducted in advance." *Buck v. Dahlgren,* 23 Cal.App.3d 779, 784, 785–86, 100 Cal.Rptr. 462, 466 (1972). The effect of reducing the principal sum in this way and yet charging interest on the face amount of the loan is analogous to those cases in which the lender does not disburse the full amount of the loan (for a variety of reasons) but charges interest as if he had. In either case the borrower is denied the full benefit of the proceeds but bears the full burden of the interest. But unlike the classic prepaid interest situation encountered in *Buck v. Dahlgren,* in the present case the so-called prepaid interest [8] was not paid directly to the lenders' collective pocket unfettered with conditions for its use; rather, it was placed into an account with a third party, earned interest for the borrowers, and was unavailable for the lenders' use except for the 12 monthly interest-only payments.[9] Also, the lenders considered the fund to be additional security or collateral—a method to ensure the interest payments would be made given the borrowers' admitted inability to procure other money for that purpose. These facts convince the Court that the subject arrangement is actually more akin to an "undisbursed principal" case in which the lender retains some control over a portion of the loan proceeds yet charges interest on the entire face amount. The Court reaches this conclusion notwithstanding the inadvertent "prepaid interest" language on the loan documents. Under certain circumstances an "undisbursed loan" presents usury problems.

The general rule precludes charging interest on sums not disbursed to the borrower. *Collins v. Union Federal Sav. and Loan Ass'n,* 662 P.2d 610 (Nev.1983). "A loan is 'disbursed' if the borrower has 'control' over the proceeds." *Collins,* 662 P.2d at 619. The *Collins* court addressed the concept of "control" in the context of a construction loan that was disbursed from a Loan-in-Process (LIP) account according to terms contained in the Building Loan Agreement. The Court decided there was a genuine issue of material fact regarding the borrower's degree of control over the funds and remanded the question to the trial court.[10] In its "control" discussion, the court cited *Tri-County Federal Sav. and Loan Ass'n v. Lyle,* 280 Md. 69, 371 A.2d 424 (1977) and *Knight v. First Federal Sav. and Loan Ass'n,* 151 Ga.App. 447, 260 S.E.2d 511 (1979). In *Tri-County,* the Maryland court found a loan usurious because although the lender had charged interest on the full amount, only 75% was subject to the borrowers' control. The remaining 25% to be used ostensibly for later materialmen payments was deposited in the lender's general account with a different bank and used to pay the lender's monthly expenses. Given this arrangement the court said, "[a]t no time was this [the undisbursed sum] under the Lyles' control, or under their partial control, as it might have been had it been held in escrow by others for their account, even though subject to restrictions. It was deposited in Tri-County's general account, and remained there from the day the Lyles signed the note until repayment was made." 371 A.2d at

---

**8.** The loan's documentation repeatedly described the $48,000.00 as prepaid interest, but Keller denied at trial the accuracy of the language and lamented that he had failed to notice it and correct it.

**9.** While not demonstrated by the evidence, it is immaterial that TMM may have incidentally benefitted from the use of this money in the form of commissions while nominally on deposit in its trust account. The Court has already found that Keller dba TMM was neither the lender nor the lenders' agent.

**10.** In *Collins* the Building Loan Agreement provided for two possible disbursement plans: one using the LIP account and the other the lender's general account. The record did not show into which account the loan funds were deposited, and the account used was crucial to the question of control.

426. In *Knight,* the court concluded that because *both* the lender's and the borrower's use of a similar fund was restricted, the escrow fund did not create a usurious loan. Apparently the Nevada Supreme Court adheres to the view that unrestricted use by the lender of any undisbursed amount (a monopoly of control by the lender) creates a potentially usurious loan, while restrictions common to both lender and borrower (rough equality of control or lack thereof) do not. In the former the loan is "undisbursed"; in the latter it is "disbursed."

In *Hoffman v. Key Federal Sav. and Loan Ass'n,* 40 Md.App. 438, 392 A.2d 1121 (1978), the loan proceeds were transferred by the lender to the borrowers, who were then required to deliver the money to "trustees" (who were, not coincidentally, lender's officers) who deposited it in a non-interest bearing account with the lender for future disbursement as construction progressed. While on deposit, the funds were generally available for the lender's use, along with all other money on deposit. The court held that under this arrangement the borrowers had no real control and the lenders had never relinquished control:

> Some restrictions as to use or possession may be imposed. But when the totality of the restrictions, or the totality of the circumstances under which they are imposed, is so pervasive as to negate the reality of an actual relinquishment of use and control, so long as that condition pertains, there has not been the forebearance or transference of use required in order to assess interest.

392 A.2d at 1126. The issue of control was also addressed by the Supreme Court of Texas in *First State Bank of Bedford v. Miller,* 563 S.W.2d 572 (Tex.1978). In *Miller,* the terms of the loan included a requirement that the borrowers leave $14,000.00 of the $70,000.00 loan on deposit with the lender in a non-interest bearing account, to be used for payment of the first two years' interest. The lender had full use of the $14,000.00, while the borrowers had no access to it for any purpose other than making the interest payments. The court held that because the borrowers only had use of $56,000.00, interest could only be charged on that lesser amount and not on the full $70,000.00.

In another Texas case decided soon after, *Texas Int'l. Mtg. Co. v. M.P. Crum Co.,* 564 S.W.2d 421 (Tex.Civ.App.1978), in which the lender required the borrower to place 20% of the loan proceeds into an interest-bearing account with a third party, the Civil Court of Appeals distinguished *Miller* and said:

> "This case is not one in which the lender required the borrower to keep part of the loan proceeds on deposit with the lender, thus permitting the lender to use it in making loans to others. Here the only benefit to the lender from the $100,000.00 deposit was as security for the loan, so far as the present record shows. There is neither pleading nor proof that the lender ... obtained an indirect benefit from the deposit, so that the arrangement was, in fact, a subterfuge to conceal usury. Although it is true that the borrowers were not free to use the $100,000 as they pleased, the funds were nevertheless employed to their benefit. They received interest payments under the certificate of deposit, and the usage restrictions were merely a consequence of their agreement with the lender to use the $100,000 as partial security for the $500,000 obligation. Since the borrowers thus received the benefit of the entire $500,000.00 loan, interest was properly charged on the full amount of the obligation."

546 S.W.2d at 422.

Similar to the *M.P. Crum* case, the present case did not involve the retention of loan proceeds with the lender, but only the lenders' use of an account with a third party (TMM) as security for the loan. Also, the borrowers received the benefit of the money in the form of interest payments, and the lenders effectively relinquished control—the restrictions for use of the money were shared by both the lenders and the borrowers. Moreover, the present

facts do not show lenders were allowed unrestricted use of the undisbursed amount, but show shared restrictions consistent with the use of the fund as "additional security." On balance, the court concludes the lenders were at liberty to charge interest on the $48,000.00 fund, because this amount was "disbursed."

### III.

■ As cited earlier, § 99.035.1 of the 1979 usury statue defined "interest" to include "every payment made to the lender *or with his knowledge to any third party as an incident to or condition of the extension of credit*, such as a commission bonus, fee, premium *or penalty.*" (Emphasis added.) In support of their argument that the late charges assessed in this case render the loan usurious, the defendants cite the above statute and the Massachusetts case of *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167 (1980).

The note provides for the payment of "late penalt[ies]" to TMM, the "third party collection agent." (Evidence showed that although WTGC received the loan payments and disbursed them, TMM was responsible for ultimate collection in case of default.) Even if the Court were to assume the late charges were in the nature of penalties (as the note itself so describes them), no evidence was presented to show these charges were incurred (not yet exacted) "as an incident to or condition of the extension of credit" so as to be includable as interest under § 99.035. Therefore, they are not properly a part of the interest calculus.

The holding of *Begelfer v. Najarian* is distinguishable from the present case. That court held that the Massachusetts statutory definition of interest included charges based upon the promissory note's default charge which exacted up to 15% of the overdue amount [rather than the flat daily rate found here]. The pertinent statute read:

The amount to be paid upon any loan for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forebearance to enforce payment, and all other sums charged against or paid by the borrower for making or securing directly or indirectly the loan. . . .

G.L. c. 271, § 49. As is easily seen, this statute is much more inclusive than Nevada's. While holding against the lender, the court nonetheless recognized the general rule (inapplicable in Massachusetts because of the above statute), "that a provision in a note for default charges or a higher rate of interest after maturity than permitted by law is not considered usurious if adopted in good faith." *Id.* 409 N.E.2d at 172. The rationale for this rule is that such charges "do not have to pass muster under usury statutes because the buyer can avoid them by discharging his debt in a timely manner." *Id.* Apart from the demands of the statute, the court concluded that the amounts recoverable upon default, if they were to be treated instead as liquidated damages, would be struck down as " 'unreasonably and grossly disproportionate to the real damages.' " (The amount due because of late charges was $99,522.50; without such charges, only $48,487.50.)

■ While not afoul of Nevada usury law, these late charges are alternatively challengeable as void penalties because they are an unreasonable assessment of liquidated damages.[11] "[T]he party challenging the [liquidated damage] provision must establish that its application amounts to a penalty. . . . In order to prove a liquidated damage clause constitutes a true penalty, the challenging party must persuade the Court that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev.1982). Little persuasion is necessary

---

11. *See Garrett v. Coast and Southern Federal Sav. and Loan Ass'n,* 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973). Plaintiff made the argument that these late charges are a form of liquidated damages and reasonable as such.

here. TMM turned over collection of the debt to counsel very early in the matter. And as reasonable attorney's fees incurred in collection are recoverable, the actual costs of collection will be compensated. Apart from minor administrative or accounting costs the Court cannot see what other collection costs TMM has incurred. Instead of approximating the actual damages arising from collection, the Court can only conclude the late charges assessed herein are but a windfall to Keller. The thousands of dollars claimed are plainly disproportionate to the actual damages sustained and, accordingly, are disallowed as penalties.

### Conclusion

Having concluded that Keller dba TMM was not the true lender, that the $48,000.00 fund did not reduce the amount of principal upon which interest could be charged and was not prepaid interest, and that the accruing late charges are not includable as interest but are void as penalties, plaintiff's claim against the defendants, less the late charges, generally stands as stated.[12] This memorandum decision shall constitute Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052. Counsel for plaintiff is directed to lodge with the Court a judgment consistent herewith.

---

**12.** The loan's principal amount, interest at the contract rate, and reasonable attorney's fees as provided by contract. Although the defendants have not challenged the reasonableness of the attorney's fees claimed, counsel for Keller is directed to apply for approval of any amount requested so that such a determination can be made by the Court.