**HUBBARD BUSINESS PLAZA, a Nevada general partnership, Plaintiff,**

v.

**LINCOLN LIBERTY LIFE INSURANCE COMPANY, a Nebraska corporation, Defendant.**

**LINCOLN LIBERTY LIFE INSURANCE COMPANY, a Nebraska corporation, Counterclaimant,**

v.

**Robert DELLER; Theodore J. Day; Jack E. McCorkle; Ray L. Wilbur III; et al., Counterdefendants.**

No. CV–R–82–7–ECR.

United States District Court, D. Nevada.

Dec. 12, 1986.

Richard W. Horton, Reno, Nev., for plaintiffs and counterdefendants Robert R. Deller, Theodore J. Day, Jack E. McCorkle, Ray L. Wilbur, III, Preston Q. Hale & Hubbard Business Plaza.

Franny A. Forsman, Las Vegas, Nev., and Jesse M. Villareal, Dallas, Tex., for defendant Lincoln Liberty Life Ins. Company.

C. David Russell, Guild, Hagen & Clark, Reno, Nev., for counterdefendants Nevada Nat. Bank and Lenny See.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., Chief Judge.

Plaintiff (Hubbard) brought this action in January of 1982 seeking to have defendant (Lincoln) restrained from collecting on a letter of credit Hubbard had given to Lincoln to secure payment of liquidated damages which would become payable to Lincoln if Hubbard defaulted on a loan commitment agreement (l.c.a.) which the parties executed under date of June 1, 1979.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1332(a)(1).

On September 15 and 16, 1986, a trial before the Court was held with respect to the specific issues mentioned below.

According to the l.c.a. Lincoln agreed to lend Hubbard $1,100,000, under certain terms and conditions, as permanent financing for a project for construction of three office buildings on a parcel of land in Reno, Nevada. The l.c.a. provided that in the event Hubbard defaulted because of inability to meet the conditions required to take down the loan, it would pay Lincoln $22,000 in liquidated damages. The payment of the liquidated damages was secured by a letter of credit for $22,000. Hubbard was unable to satisfy the conditions to take down the loan and defaulted. Hubbard now alleges that Lincoln is not entitled to collect on the letter of credit because the $22,000, if paid, would constitute the payment of a penalty rather than liquidated damages.

Hubbard also seeks a declaration that Lincoln is in breach of an agreement of June 9, 1980, which extended the loan commitment of June 1, 1979, under certain modified conditions for an additional period of 18 months.

Lincoln contends that it is entitled to the $22,000 as liquidated damages and is on that basis entitled to collect on the letter of credit.

After an evidentiary hearing this Court, under date of March 30, 1982, previously issued a preliminary injunction restraining Lincoln from collecting upon the letter of credit. The evidence adduced at the hearing on the preliminary injunction is (to the extent admissible at the trial) being considered by the Court as part of the record for the decision to be made by the Court at this time. *See* Fed.R.Civ.P. 65(a)(2). The preliminary injunction was, of course, issued under a different burden of proof than the Court must apply here in determining whether a permanent injunction should now be issued or the preliminary injunction dissolved.

The parties (with the approval of the Court) have entered into a stipulation whereby the issues mentioned above would be tried at this time before the Court on the plaintiff's complaint and the separate issues raised in Lincoln's counterclaim and third party complaint would be tried in a separate jury trial to be conducted after the decision on the issues now before the Court and final decision as to any appeal therefrom.

■ This is a diversity case removed from state court. Therefore, the law of the State of Nevada is applicable to the substantive issues. *Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co.*, 596 F.Supp. 344, 346 (D.Nev.1984) (prior memorandum decision and order issued in the case at bar) *citing Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir.1960). It is the obligation of

this Court to apply Nevada law as it is, not as it ought to be. *Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346–347 (9th Cir.1974); *Southern Pacific Transp. Co. v. United States*, 462 F.Supp. 1227, 1233 (E.D.Cal.1978). This Court is not free to predict possible changes in the Nevada law. *Moore v. R.G. Indus., Inc.*, 789 F.2d 1326, 1327 (9th Cir.1986). Nor is the Court free to engraft upon prior state decisions exceptions or modifications which have not been adopted by the state courts. *Stancil v. Mergenthaler Linotype Co.*, 589 F.Supp. 78, 81 (D.Haw.1984). *See also Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975).

Preliminarily, the Court notes that the defendant makes some argument that the provision requiring payment by Hubbard of $22,000 upon its failure to take down the loan is not a liquidated damages provision, but is a provision that provided for the payment by Hubbard of consideration for services to be performed by Lincoln. The contractual provision did refer to the possible $22,000 payment as being "[i]n consideration of our issuance of this commitment in holding ourselves willing and ready to make the loan referred to herein, and in consideration of the substantial services we have rendered and will be required to render and the expense which we will incur in the preparation for closing." The language of the provision at issue can be found at page 8 of Lincoln's Statement of Facts, document number 148.

On the other hand, the provision is titled "Liquidated Damages." Also, the provision was entered "in view of the difficulty of ascertaining the amount of damages which would be sustained by [Lincoln] should the within contemplated loan not be acquired...." The language goes on to provide that Hubbard was "obligated to pay to [Lincoln] liquidated damages in the amount ...".

■ The language of the contract is ambiguous as to exactly what the $22,000 payment would be for. The provision was drafted by Lincoln and, therefore, should properly be construed in favor of Hubbard.

*National Union Fire Ins. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 365, 682 P.2d 1380, 1383–1384 (1984); *Estwin Corp. v. Prescription Center Pharmacy, Inc.*, 93 Nev. 251, 252, 563 P.2d 78, 79 (1977).

Moreover, there are two facts that suggest that the $22,000 payment would either reimburse Lincoln for damages due to a breach by Hubbard or penalize Hubbard for such a breach. First, another provision of the contract required Hubbard to pay a non-refundable $11,000 commitment fee which was apparently meant to cover the costs incurred by Lincoln in preparing the loan. Because those costs were covered by that payment, it would have been unnecessary to cover them with another, uncertain, payment. Second is the fact that the $22,000 was conditional. The $22,000 payment was not to be required in case Hubbard took down the loan from Lincoln as the contract required. If Hubbard had taken the loan, Lincoln would still have incurred the expenses associated with preparing the loan. It therefore appears that the parties did not intend the $22,000 payment to be consideration for service provided to Hubbard by Lincoln.

The primary issue which this Court must now decide is whether the $22,000 constitutes liquidated damages which would entitle Lincoln to collect on the letter of credit, or constitutes a penalty which would entitle Hubbard to a permanent injunction against the collection of the letter of credit.

■ Liquidated damage provisions are prima facie valid; the party challenging the provision must establish that its application amounts to a penalty. *Haromy v. Sawyer*, 98 Nev. 544, 546–547, 654 P.2d 1022, 1023 (1982); *Silver Dollar Club v. The Cosgriff Neon Co., Inc.*, 80 Nev. 108, 112, 389 P.2d 923, 925 (1964).

The intention of the parties is the overall inquiry. *See Silver Dollar Club*, 80 Nev. at 112, 389 P.2d at 925. There are several ways that the party challenging the liquidated damages can show that the liquidated damages provision was actually intended to provide for a penalty.

**1314**

■ (A) First, Hubbard may show that the $22,000 was not a reasonable forecast of the damages Lincoln would be anticipated to suffer as a result of default by Hubbard in taking down the loan in accordance with the l.c.a. *See* Restatement (Second) of Contracts § 356 (1979); 25 C.J.S. *Damages* § 108 and cases cited thereat.

Evidence presented at the trial shows that it would have been anticipated that Lincoln would suffer the following damages if Hubbard defaulted in taking down the Loan:

"(a) It would be expected (as did occur) that Lincoln would have incurred expenses in processing the loan commitment application and in issuing the loan commitment evidenced by the l.c.a. Hubbard paid $11,000 as a loan commitment 'fee' at the time the l.c.a. was executed. It is reasonable to assume that this $11,000 should have paid for whatever Lincoln was out in processing the application for the loan to the point of the l.c.a. It might be argued that the loan commitment fee was simply something that Lincoln was entitled to receive as consideration for issuance of the loan commitment independent of whatever services it was required to perform in that connection. However, the better inference is that Hubbard paid $11,000 for the loan commitment and that included payment for whatever expenses Lincoln incurred in processing the application and issuing the l.c.a. This is not to conclude that $11,000 in services had been performed by Lincoln by the time the l.c.a. was issued. Some substantial portion of the $11,000 may have represented (and no doubt did represent) pure profit to Lincoln for issuing the loan commitment.

"(b) It would be expected that Lincoln would incur expenses in processing the loan from the point of commitment to the time the breach or default of Hubbard occurred. Donna Wynne, an attorney and executive for Lincoln's related corporation which was in charge of processing loans for Lincoln, testified as to the extensive work she did in processing the application, in preparation and issuance of the l.c.a., and in following up after the l.c.a. was issued to see that the requirements of the l.c.a. were performed, that things were organized to process the loan for timely closing, and that all the necessary documents were prepared and executed anticipatory to the closing of the loan. Work was also required by others for Lincoln in order that the loan could be processed after the time the l.c.a. issued.

"Evidence was presented that the San Francisco office of the corporation which was assigned the obligation by Lincoln of processing the loan to Hubbard incurred on the average an expense of $20,379 in connection with each commitment with which that office was involved in 1979. There was no breakdown offered to show what portion of this figure was attributable to expenses incurred up to the time a loan commitment was issued as contrasted with expenses incurred after an l.c.a. was issued or in connection with the actual closing of loans which did close. It was brought out in cross-examination that some of the expense of operating the San Francisco office must be attributed to activities other than loan commitments issued by that office. However, the record does indicate that a substantial portion of the $20,379 expense would have been attributable to services rendered after a commitment was issued and up to a time just prior to an anticipated closing as here, where prior to the date for close it became clear that Hubbard would not be able to meet the conditions for the loan.

"In the case at bar the loan commitment was extended beyond the originally agreed closing date (and beyond the original period of the loan commitment provided in the l.c.a.). Additional work had to be performed for Lincoln in relation to the extension. A reasonable forecast of damages which might be suffered by Lincoln in the event of breach by Hubbard would have considered that an extension for Hubbard to meet the conditions of the loan might become necessary.

"It was fair to assume at the time the l.c.a. was executed that the amount Lincoln would be out would be some reasonably

substantial portion of a figure approximating $20,379 if the loan was not closed because of breach by Hubbard. While the $20,379 figure has been determined in retrospect, Lincoln must have been conscious of its rate of expenditures being incurred at that time. The partners of Hubbard were all sophisticated and experienced in the field of real estate and loans and would also have anticipated that substantial expenditures of the nature and amount reported by Lincoln would have to be made to process the loan over the period from the time from when the l.c.a. was executed until the time of closing.

"The testimony of Phillip Eden was presented by Lincoln to show that a reasonable forecast of the damages Lincoln might suffer if Hubbard did not take down the loan would include a factor attributable to the instability of interest rates on loans which was being experienced at that time. If interest rates fall between the time of a loan commitment and the anticipated closing date, the borrower will not take down the loan at the agreed rate because he will be able to obtain the money cheaper in the market and the lender will lose the benefit of the higher, agreed upon interest rate and will be stuck with the cost of processing the loan. If interest goes up the borrower will take the loan because it has been committed at a rate lower than the market at the time of the agreed closing.

"A factor of 2% of the loan (which the $22,000 represents) to cover the possible decrease in interest rates which might be experienced before a default could have been properly included in the forecast of damages Lincoln might suffer if Hubbard defaulted and did not take down the loan. The fact that the reason Hubbard did not take down the loan in the final analysis was due to its inability to obtain sufficient tenants and had no relationship to the change in interest rates which occurred over that period of time is really irrelevant to the question of whether the $22,000 agreed to as liquidated damages was a reasonable forecast of Lincoln's damages in the event of default by Hubbard. Both Lincoln and the Hubbard partners would

have been familiar with the state of the market for interest on real estate loans at that time and would have recognized the unstable interest market.

"(c) One other factor which should be taken into account is that the negotiations between the parties do not show that the parties negotiated for a liquidated damages figure which would equate to the damages Lincoln would suffer on a breach by Hubbard.

"However, on a basis of the preponderance of the evidence, the Court concludes that the $22,000 figure was a reasonable forecast of the damages Lincoln would suffer if Hubbard did not take down the loan."

■ (B) The second test as to whether an agreed amount of liquidated damages should be considered to be such or instead a penalty is whether the harm to Lincoln which might occur on account of Hubbard's breach was incapable of or difficult to accurately estimate. *See* Restatement (Second) of Contracts § 356 (1979); 25 C.J.S. *Damages* § 107 and cases cited thereat.

Here, in this case it would have to be believed that Lincoln would at the outset be able to estimate at least in general terms the amount of office overhead and labor expense it would be out if everything went pretty much as expected and yet the loan did not close. However, the course of real estate transactions is not always smooth or easily predicted. It must be assumed there would be a substantial uncertainty as to exactly what might happen in a particular instance and there would be a built-in difficulty in making an accurate estimate or even a close estimate in a particular transaction. Furthermore, the future of the market for interest on real estate loans would have been even more difficult to estimate at the time l.c.a. was issued. The market was in great flux and the harm that might possibly be caused to Lincoln by a fall in the market and by a breach by Hubbard was certainly difficult or impossible to accurately estimate.

From the viewpoint of the parties at the time of the execution of the l.c.a., it must

be concluded that to a substantial extent the harm which might be caused by the breach of Hubbard was incapable or difficult of accurate estimation, because of the volatile interest market.

(C) In Nevada a third test is used to determine if the claimed liquidated damages are in fact liquidated damages or rather a penalty. This test allows the party contesting the liquidated damages provision to prove the provision is one for a penalty by showing the agreed liquidated damages to be disproportionate to the actual damages suffered by the lender. This rule has been developed in the Nevada Supreme Court cases of *Silver Dollar Club v. The Cosgriff Neon Co., Inc.,* 80 Nev. 108, 389 P.2d 923 (1964) and *Haromy v. Sawyer,* 98 Nev. 544, 654 P.2d 1022 (1982).

In *Silver Dollar Club,* the court upheld the award of the entire balance due under a liquidated damages provision in a sales contract saying:

> If Appellant had introduced evidence showing that the actual damages were considerably smaller than the amount stipulated, this could be regarded as an indication that the amount named was intended as a penalty but no such evidence was introduced.

*Silver Dollar Club,* 80 Nev. at 112, 389 P.2d at 925.

In *Haromy,* the court affirmed the state district court's finding that a liquidated damages clause amounted to a penalty. The court said:

> In order to prove a liquidated damage clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party.

*Haromy,* 98 Nev. at 547, 654 P.2d at 1023. *See also, In re Bryant,* 39 B.R. 313, 323–324 (Bkrtcy.D.Nev.1984).

The analysis of this issue in this case boils down to the meaning of the term "actual damages." Here, as set forth in the analysis above Lincoln was out in actual expenses because of the Hubbard breach some reasonably substantial portion of a figure approximating $20,379 in expenses incurred by the San Francisco office of the related corporation of Lincoln which processed the loan. These were expenses which Lincoln would have anticipated recovering from the interest it would have derived from Hubbard's payments on the loan if it had closed. While, as mentioned above the portion of the $20,379 figure which may be attributable to the expenses incurred by Lincoln after the l.c.a. was issued and up to the time of the breach, cannot be calculated from this record with exactitude, nonetheless it cannot be said that Hubbard has carried its burden of proof (which it must in this case sustain) to show that these particular actual damages Lincoln suffered are disproportionate to the agreed liquidated damages.

However, Hubbard contends that because the interest rates for investments rose sharply during the period of time involved here, other investments could readily have been made by Lincoln (and no doubt were actually made) which would have substantially more than recouped the actual damages detailed above suffered by Lincoln as a result of Hubbard's breach. Lincoln argues that the fact it could recoup what it was out as a result of Hubbard's breach by making more favorable investments with the money originally committed to the Hubbard loan than would have been realized from the interest on the Hubbard loan constitutes only a mitigation of damages by Lincoln.

According to Blacks Law Dictionary, Revised Fourth Edition, "actual" means "real" or "substantial;" "existing presently in fact." According to Webster's Third New International Dictionary "actual" means "existing in fact or reality." In short, actual means actual. It means real damages suffered.

■ Applying these definitions to what occurred in this case, it cannot be concluded that Lincoln suffered any actual damages. Lincoln was ahead of the game because Hubbard defaulted. If Hubbard had been able to meet the requirements for the

loan, Lincoln would have banked less profit than it did after the Hubbard default. Lincoln suffered no actual damages because of the Hubbard breach.

According to the rule applied in Nevada, therefore, the $22,000 agreed liquidated damages constituted a penalty and are not collectible. A permanent injunction should be entered restraining Lincoln from collecting on the letter of credit.

An injunction is an extraordinary remedy not lightly dispensed by a federal court. A federal court does, however, have substantial discretion in whether to issue an injunction. *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). An injunction will not issue if the equities do not favor the party requesting the injunction; and, further, an injunction should not issue unless there is substantial evidence of impending irreparable injury and lack of an adequate remedy at law. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); *Allee v. Medrano*, 416 U.S. 802, 814, 94 S.Ct. 2191, 2199, 40 L.Ed.2d 566 (1974); *Tara Enterprises, Inc. v. Humble*, 622 F.2d 400 (8th Cir.1980). Injunctive relief must be carefully tailored to avoid unreasonably punitive or non-remedial effect; *U.S. v. Holtzman*, 762 F.2d 720, 726 (9th Cir.1985); and the language of injunctions must be reasonably clear so that ordinary persons would know exactly what action is proscribed. *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1525 (9th Cir.1983), *cert. den.*, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984). Finally, an injunction will not issue if it would not be in the public interest. *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).

Hubbard partners will suffer irreparable harm if collection of the letter of credit is not restrained. The credit and business reputations of the partners will be damaged and injured if the letter of credit is collected upon. The partners may be looked upon as persons who have defaulted on a loan. This could affect their credit and their ability to obtain loans in the future in connection with their development and real estate businesses. There is no indication that Lincoln would suffer any comparable harm. The balance of irreparable harm between the parties, as well as the public interest in preventing collection of penalties, mandates the entry of a permanent injunction against the collection of the letter of credit.

The other issue to be decided by the Court at this stage of the proceedings is whether the Court by its judgment should declare that Lincoln is in breach of the agreement constituted by its letter of June 9, 1980, which was approved by Hubbard.

A brief exposition of the facts which relate to this issue is appropriate here. After negotiations through a loan broker, Nicholas Temple, representing Hubbard, Hubbard (the Hubbard partnership at that time consisted of Robert Deller, Ray L. Wilbur, III, Theodore J. Day and Jack E. McCorkle) and Lincoln signed the l.c.a. under date of June 1, 1979. It provided, among other things, that Lincoln would loan Hubbard $1,100,000 for a period of 30 years at a level interest rate of 10⅜%. The l.c.a. required that, at the time of close of escrow, the offices in the buildings to be constructed on the subject property would be rented to the extent of 77.2% of rentable units and reflect a gross annual fixed income of not less than $160,570. The borrower was to be the Hubbard partnership consisting of the partners named above. The loan was required to close by June 14, 1980. The commitment from Lincoln was a condition to an interim loan which was obtained from Nevada National Bank (NNB) for construction of the three proposed office buildings on the parcel of land that had been acquired for the project. The construction was duly completed as far as the shells of the buildings and some tenant improvements for those tenants who were signed up. The problem which arose and which overwhelmed the project was that Hubbard was unable to obtain sufficient tenants to meet the percentage of rentable units or gross annual fixed income required

to meet the l.c.a. It became necessary for Hubbard to seek an extension of the interim loan from NNB. Hubbard was not in a position to meet the said rental and income requirements to close the loan as required on June 14, 1980. Hubbard also failed to comply with several of the other requirements to close the loan by the deadline. Hubbard defaulted on the l.c.a.

Lincoln agreed by the letter dated June 9, 1980, not to collect on the letter of credit (which it had received under the original l.c.a.) for a period of 18 months if the expiration date of the letter of credit was extended 20 months and the leasing requirements and net rental receipt requirements (the latter appears to have been somewhat modified from the l.c.a.) were met. Hubbard was on that basis to be allowed to "reapply" for the loan. While it is not entirely clear, it appears that the other requirements (not modified in the letter of June 9, 1980) remained a part of the agreement, except that the interest rate of 10⅜% was changed to the interest rate Lincoln was quoting for comparable loans at the time of close under the extension of June 9, 1980. Hubbard agreed to this proposal and obtained a new letter of credit for the required period.

As things progressed, Hubbard was still unable to achieve the leasing and net income requirements imposed by the l.c.a. as modified by the letter agreement of June 9, 1980. Monthly payments of $15,000 to $20,000 per month were required to be made by Hubbard on the interim loan to NNB. The monetary drain was too much for the Hubbard partners, Deller and Wilbur, and they sold out to the remaining partners, Day and McCorkle, and a new partner who entered the partnership, Preston Q. Hale. Also during this period, apparently to reduce the financial drain, Hubbard sold off the parcels of land (with the improvements) on which two of the three buildings had been constructed. One parcel was sold to Chilton Engineering, a Nevada partnership, and one to Blue Lizard Investment Co., also a Nevada partnership.

The real estate loan market had become very erratic and Hubbard partners heard via the grapevine that Lincoln was out of the business of making loans. Therefore, the Hubbard partners decided to send a letter to Lincoln whereby Hubbard would supposedly, in accordance with the agreement of June 9, 1980, "reapply" for the loan. The letter sent represented that the leasing and net income requirements of the June 9, 1980, agreement had been met. The letter listed certain purported tenants and represented that there was a net operating income in excess of the minimum requirement. The l.c.a. required fully executed copies of all leases to be submitted prior to close. Mr. McCorkle testified that while leases had been signed only with some of the tenants, all of the tenants listed in the letter of December 4, 1981, were committed to pay rent or were paying. The statement of income attached to the letter was incorrect in that it represented that such net income was being received, while it was not. The income reported was merely an assumption of what the net income from rentals would be if the buildings were tenanted according to the tenants already in occupancy and the commitments made to rent space.

The letter of December 4, 1981, implied that the parcels which had been sold to Chilton and Blue Lizard were still owned by Hubbard and were leased by Hubbard to those two partnerships and other tenants apparently in occupancy of the buildings owned by Chilton and Blue Lizard.

Mr. McCorkle admitted that at the time the letter was sent Hubbard was in no position to meet the terms of the June 9, 1980, agreement, but that Hubbard felt it could qualify for the loan by later restructuring the partnership by adding, it is assumed, the Chilton and Blue Lizard partners and the conveyance of their parcels back to Hubbard.

The letter of December 4, 1980, was characterized by Mr. McCorkle as "insufficient." It was all of that. It misrepresented the situation of Hubbard and the property. Whether Hubbard could have met

the requirements of Lincoln to close the loan contemplated by the June 9, 1980, agreement is problematical, and it may be concluded that those requirements could not have been met by the deadline for close of the loan (18 months after June 9, 1980). According to Hubbard partners who testified at the trial the letter of December 4, 1981, was sent as a "pretense" to see of Lincoln was still in the business of lending on real estate loans. The Court concludes that the purpose of the letter was to try to save the $22,000 tied up in the new extended letter of credit. Hubbard partners believed that if Lincoln was unwilling to make the loan, it would be unable to collect on the letter of credit.

On December 10, 1981, Lincoln responded to the Hubbard December 4, 1981, letter stating it was not possible for Lincoln to consider making the loan because it was then currently out of the business of making such loans and the reapplication had been made too late for a timely close. After that, Lincoln presented the letter of credit for collection and a temporary restraining order (and later a preliminary injunction) was issued restraining collection of the letter.

■ Hubbard is not entitled to a declaration that Lincoln is in breach of the agreement of June 9, 1980. Hubbard did not in the letter of December 4, 1981, validly reapply for the loan. The letter was a mere "pretense." It was not intended to be and was not a valid reapplication for the loan. Nor in this analysis does Lincoln come off much better. It was not willing, had it been validly called upon to do so, to make the loan, which it had agreed to make.

The foregoing shall constitute findings of fact and conclusions of law.

IT IS, THEREFORE, HEREBY ORDERED that a permanent injunction shall issue restraining collection of the letter of credit. The bond filed in respect to the preliminary injunction is exonerated.

IT IS FURTHER FOUND AND ORDERED that plaintiff is not entitled to a declaration that Lincoln is in default in respect to the agreement constituted by the letter of June 9, 1980.